UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EVGENY EPIKHIN and DMITRI REDLIKH,<br><br>        Plaintiffs,<br><br>        v.<br><br>GAME INSIGHT NORTH AMERICA, et al.,<br><br>        Defendants. | Case No. 14-CV-04383-LHK<br><br>**ORDER GRANTING MOTION TO DISQUALIFY COUNSEL** |

Plaintiffs Evgeny Epikhin ("Epikhin") and Dmitri Redlikh ("Redlikh") (collectively, "Plaintiffs") bring suit against defendants Game Insight North America, Game Insight, and GIGL (collectively, "Game Insight") and Game Garden, LLC ("Game Garden") (together, with Game Insight, "Distributor Defendants"), as well as against Fly High Games ("Fly High") and Yury Pomortsev ("Pomortsev"). Before the Court is Game Garden's motion to disqualify Plaintiffs' counsel, Shannon Gallagher ("Gallagher"). ECF No. 25.

The Court finds this matter suitable for decision without oral argument under Civil Local Rule 7-1(b) and hereby VACATES the motion hearing set for May 14, 2015, at 1:30 p.m. The case management conference set for that date and time is hereby CONTINUED to June 11, 2015, at 1:30 p.m. Having considered the submissions of the parties, the relevant law, and the record in

this case, the Court hereby GRANTS Game Garden's motion to disqualify Plaintiffs' counsel.

## I. BACKGROUND

### A. Factual Background

The crux of this lawsuit is who owns the rights to *Cat Story*, a free mobile application ("app") in which players build a virtual village for cats shipwrecked on an island and send the cats on various quests and adventures. ECF No. 1 ("Compl.") ¶¶ 21-23, 50-60. The app is distributed by Game Garden and Game Insight, pursuant to a license from Fly High. *Id.* ¶¶ 29, 54-57. From November 2011 to September 2013, Game Garden, a California Corporation, was owned by Pomortsev, Maxim Bakanovich ("Bakanovich"), and Plaintiffs. *Id.* ¶ 34; ECF No. 26-1 ("Redlikh Decl.") ¶ 3.[1] Game Garden was managed by Taras Titarenko ("Titarenko"), Redlikh's lifelong friend. Redlikh Decl. ¶ 13; ECF No. 26-2 ("Titarenko Decl.") ¶ 1.

Plaintiffs allege that the app which became *Cat Story* was first conceived in early 2012 at South Port Studios, LLC ("South Port"), a Russian corporation owned solely by Redlikh but managed by Pomortsev. Compl. ¶¶ 20-23; Redlikh Decl. ¶¶ 2, 9. At the time, Plaintiffs say, the app was called *PussyVille*. Compl. ¶ 24. According to Plaintiffs, South Port employees participated in various tasks related to *PussyVille*, including development of the game concept; creation of art, code and graphics; deployment of game mechanics; and development of a marketing strategy for the app. *Id.* ¶ 25. Plaintiffs claim that *PussyVille* contained computer code based on and derived from code created by South Port in connection with earlier app projects such as *Fairy Farm*. *Id.* ¶ 27.

Starting in late 2012, things started to go awry. Plaintiffs allege that Pomortsev informed Redlikh that the owner of Fly High was interested in helping develop *PussyVille* in exchange for a share in the app's profits. Compl. ¶ 37. Plaintiffs allege further that Pomortsev, without authority

---

[1] As indicated above, the Court uses "Game Garden" herein to refer to Game Garden, LLC, the California corporation, not the informal Russian partnership, apparently comprised of the same owners, that is not a party to this litigation. *See, e.g.*, ECF No. 42 at 4-5 (joint case management statement explaining the difference between "Game Garden Partnership" and "Game Garden, LLC"); Redlikh Decl. ¶¶ 10-12 (describing "the informal group Game Garden").

or Plaintiffs' prior consent, began to share with Fly High information regarding *PussyVille*. *Id.* ¶ 38. While this sharing was happening, Plaintiffs claim that Pomortsev was representing to them that South Port employees were no longer working to develop *PussyVille*. *Id.* ¶ 40. In an e-mail to Plaintiffs dated January 18, 2013, Pomortsev allegedly wrote, "*PussyVille* is not being developed." *Id.* ¶ 41. Despite these representations, Plaintiffs claim that Pomortsev and Bakanovich had started a new gaming company, Fair Play Studios, which was secretly working with Fly High to develop the app that would become *Cat Story*. *Id.* ¶¶ 36, 42.

Startek Invest Limited ("Startek"), a corporation organized under the laws of Cyprus, was another company owned solely by Redlikh. Redlikh Decl. ¶ 1. Though Startek is mentioned nowhere in Plaintiffs' complaint, Redlikh says that Startek "was the owner of rights to certain gaming applications that were developed by South Port." *Id.* ¶ 6. Startek and Game Garden entered into a series of service contract agreements whereby Game Garden would distribute games created by South Port but owned by Startek. *Id.* ¶¶ 13-14; Titarenko Decl. ¶¶ 4-5. The last such agreement, dated March 21, 2013, did not include *PussyVille* in either the list of games then in development or the list of games then being distributed by Game Garden. Titarenko Decl. Ex. A. To be clear, though, Plaintiffs allege that South Port, not Startek, owned the rights to *PussyVille*. *See* Compl. ¶¶ 38, 49-50, 58.

Due to various difficulties, the relationship between Game Garden's four owners began to deteriorate beyond repair. By May 2013, the owners decided to part ways. Compl. ¶ 45. Over the next several months, Plaintiffs negotiated with Pomortsev and Bakanovich to sell Plaintiffs' ownership interests in Game Garden. *Id.* ¶ 46. Gallagher allegedly represented Plaintiffs during these negotiations, while Pomortsev and Bakanovich were represented initially by Andrey Novokreshchenov and later by Anastasiya Fugett ("Fugett"). ECF No. 26-3 ("Gallagher Decl.") ¶¶ 2-3, 5, 8; ECF No. 26-4 Exs. A-B. Fugett, whose last name at the time was Malchenko, also represented the individuals who were buying Plaintiffs' shares (the "Buyers"). ECF No. 25-2 ("Fugett Decl.") ¶ 2; ECF No. 26-4 Ex. B. Plaintiffs eventually sold their ownership interests in Game Garden to the Buyers on September 9, 2013. Compl. ¶ 48. Plaintiffs allege that the sale

3

agreement listed certain games, apps, and projects that were part of the transaction. *Id.* ¶ 49. The agreement, Plaintiffs say, made no mention of *PussyVille*, whose rights and title were allegedly transferred from South Port to Plaintiffs on September 13, 2013. *Id.* ¶¶ 49, 58.

On August 2, 2013—more than a month before Plaintiffs sold their interest in Game Garden—the domain name www.catstorygame.com was registered by Fly High's owner. Compl. ¶ 53. According to Plaintiffs, Distributor Defendants have since distributed *Cat Story* through various platforms: Game Insight began distributing *Cat Story* through Apple's App Store on September 19, 2013, *id.* ¶ 54; Game Insight began distributing *Cat Story* through Google Play on January 24, 2014, *id.* ¶ 55; Game Garden began distributing *Cat Story* through Amazon on February 1, 2014, *id.* ¶ 56; and Game Garden began distributing *Cat Story* through Windows Mobile on April 1, 2014, *id.* ¶ 57.

Plaintiffs claim to have filed for copyright protection on both *PussyVille* and *Cat Story*. Compl. ¶¶ 59-60. The record indicates that Plaintiffs have registered *Cat Story* with the U.S. Copyright Office. *See* ECF No. 23-1 Ex. A (screenshot of record of registration for *Cat Story*, Copyright Registration Number TXu 001912978). The effective date of *Cat Story*'s registration is September 24, 2014. *Id.*

### B. Procedural History

On September 29, 2014, Plaintiffs filed their complaint in this action. In the complaint, Plaintiffs allege that *Cat Story* contains significant art, graphics, and other copyrightable material created by South Port during its development of *PussyVille*; that the rights in this copyrightable material were properly assigned to Plaintiffs; and that these rights are infringed by Distributor Defendants' distribution of *Cat Story*. Compl. ¶¶ 1, 25-27, 58. On that basis, Plaintiffs bring causes of action for direct copyright infringement under 17 U.S.C. § 501 (first cause of action), contributory copyright infringement (third cause of action), and vicarious copyright infringement (fourth cause of action) against Distributor Defendants. *Id.* ¶¶ 61-73, 100-09. Plaintiffs seek damages arising from the alleged infringement as well as injunctive relief to prevent future infringement. *Id.* ¶ 1.

Plaintiffs bring additional causes of action against Pomortsev and Fly High. Specifically, Plaintiffs allege a cause of action for fraud (second cause of action) and breach of contract (sixth cause of action) against Pomortsev. Compl. ¶¶ 74-99, 118-23. Plaintiffs also allege a cause of action for declaration of copyright ownership against Fly High (fifth cause of action). *Id.* ¶¶ 110-17. Lastly, Plaintiffs bring a cause of action against all defendants for deceptive business practices under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* (seventh cause of action). *Id.* ¶¶ 124-30.

Following several stipulations to extend time to answer Plaintiffs' complaint, Distributor Defendants filed a motion to dismiss Plaintiffs' third, fourth, and seventh causes of action on January 20, 2015. ECF No. 16. Plaintiffs opposed the motion on February 3, 2015. ECF No. 23. Distributor Defendants replied on February 10, 2015. ECF No. 24.

Also on February 10, 2015, Game Garden filed the instant motion to disqualify Plaintiffs' counsel. ECF No. 25 ("Mot."). Plaintiffs opposed that motion on February 24, 2015. ECF No. 26 ("Opp."). Game Garden replied on March 3, 2015. ECF No. 27.[2]

## II. LEGAL STANDARD

"The right to disqualify counsel is a discretionary exercise of the trial court's inherent powers." *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 264 F. Supp. 2d 914, 918 (N.D. Cal. 2003). Under Civil Local Rule 11-4(a)(1), all attorneys who practice in this Court must comply with the standards of professional conduct required of members of the State Bar of California. This Court, therefore, applies state law in determining matters of disqualification. *See In re Cnty. of L.A.*, 223 F.3d 990, 995 (9th Cir. 2000).

Rule 3-310(E) of the Rules of Professional Conduct of the State Bar of California prohibits

---

[2] At the initial case management conference held on March 18, 2015, the Court was informed that Pomortsev and Fly High, both of whom reside in the Russian Federation, had not been served with process in this action. *See* ECF No. 29 at 2. However, on May 6, 2015, waivers of service were filed with the Court on behalf of Pomortsev and Fly High. ECF Nos. 40, 41. On May 11, 2015, Pomortsev and Fly High separately answered Plaintiffs' complaint. ECF Nos. 43, 44.

the successive representation of clients in certain circumstances without the informed written consent of the current client and former client. The rule provides: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

Interpreting Rule 3-310(E), the California Supreme Court has held: "Where an attorney successively represents clients with adverse interests, and where the subjects of the two representations are substantially related, the need to protect the first client's confidential information requires that the attorney be disqualified from the second representation." *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135, 1146 (1999) (citing *Flatt v. Super. Ct.*, 9 Cal. 4th 275, 283 (1994)). "To determine whether there is a substantial relationship between successive representations, a court must first determine whether the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation." *City & Cnty. of S.F. v. Cobra Solutions, Inc.*, 38 Cal. 4th 839, 847 (2006). "When a substantial relationship between the two representations is established, the attorney is automatically disqualified from representing the second client." *Id.* The burden is on the party seeking the disqualification "to show both the fact of the former representation and the existence of a substantial relationship between the former and current representations." *In re Charlisse C.*, 45 Cal. 4th 145, 166 n.11 (2008).

### III.  DISCUSSION

In its motion, Game Garden argues that Gallagher must be disqualified from representing Plaintiffs in this action. Mot. at 1. This is so, Game Garden says, because Gallagher represented Game Garden in a 2013 dispute among Game Garden's four then-owners involving the same intellectual property and because Gallagher represented Game Garden in connection with the September 2013 sale agreement that is the subject of Plaintiffs' cause of action for breach of contract. *Id.* For the reasons stated below, the Court agrees.

**A. Evidence of Substantial Relationship**

As indicated above, Game Garden has the burden of showing that Gallagher represented Game Garden previously and that Gallagher's prior representation of Game Garden bears a "substantial relationship" to Gallagher's current representation of Plaintiffs. *Charlisse*, 45 Cal. 4th at 166 n.11. To meet its burden, Game Garden offers three pieces of evidence: (1) an April 5, 2013 letter written by Gallagher and addressed to Game Garden's then-owners (Bakanovich, Epikhin, Pomortsev, and Redlikh); (2) Gallagher's invoice of services rendered for Game Garden between June 11, 2013, and August 19, 2013; and (3) e-mails Gallagher wrote to the Buyers' counsel in 2013 holding herself out as counsel for Game Garden. The Court examines each in turn.

**1. April 5, 2013 Letter**

On April 5, 2013, Gallagher sent a letter to Bakanovich, Epikhin, Pomortsev, and Redlikh—the four owners of Game Garden at that time—expressing concern ostensibly on behalf of "Game Garden" that Bakanovich and Pomortsev "have violated and are violating material terms" of, inter alia, "the Operating Agreement of Game Garden, LLC." ECF No. 25-1 Ex. A ("Gallagher Letter") ¶¶ 1-2. "In the most basic and essential terms," Gallagher wrote, "Bakanovich and Pomortsev have breached their fiduciary responsibilities by failing to advise the company of essential information; by altering agreements without the requisite authority; defrauding Game Garden out of future income; and by entering agreements without the requisite authority, including agreements that purport to give to others Game Garden's intellectual property without adequate compensation." *Id.* ¶ 4. "These actions," Gallagher continued, "expose . . . Game Garden and the LLC to unnecessary risk" and "possible liability." *Id.*

In the letter, Gallagher also wrote that her "duty is to protect your common interests, not to serve the agenda of any individual." Gallagher Letter ¶ 3. She advised that "any and all threats to the company's intellectual property interests and well-being will be taken very seriously" and that "[t]he company's interests will be protected at all costs and through all legal channels available," including "enforcement of US copyright and other intellectual-property protections." *Id.* ¶ 5.

7
Case No. 14-CV-04383-LHK
ORDER GRANTING MOTION TO DISQUALIFY COUNSEL

1    Gallagher concluded the letter by reiterating the letter's purpose: "protecting the best

2  interests of Game Garden."  Gallagher Letter ¶ 6.  She also invited all four owners to address with

3  her any concerns they might have "regarding possible violations of the duties owing to Game

4  Garden."  *Id.*  In so doing, Gallagher assured Game Garden's owners that their "communications

5  to and with [her] will be afforded the protection of attorney-client privilege as to outside (non-

6  Game Garden) parties."  *Id.*

### 2. Invoice to Game Garden

Gallagher prepared an invoice for "Client: Game Garden, LLC" for the time period "June 11, 2013 – August 19, 2013."  ECF No. 25-1 Ex. B ("Gallagher Invoice").  The document's title is "GGLLC/Startek Invoice."  *Id.*  The invoice lists thirty-nine entries, all but two of which are coded "GG" in the "Matter" column.  *Id.*  The entry dated July 9, 2013, contains the following description: "Draft sales agreement for sale of GGLLC interest."  *Id.*  Thereafter, the invoice lists eleven separate entries from July 10, 2013, to August 19, 2013, indicating that Gallagher was revising the sale agreement—i.e., the agreement for Plaintiffs to sell their ownership interests in Game Garden.  *See id.*  Other entries refer to drafting "Members' Resolutions," discussing tax issues with Game Garden manager Titarenko (denoted "TT" in invoice), and communicating with the Buyers' counsel regarding the upcoming sale of Plaintiffs' ownership interests.  *Id.*  For these legal services, Game Garden paid Gallagher in excess of $10,000.  *Id.*; ECF No. 25-1 ("Pomortsev Decl.") ¶ 10.

### 3. E-mails to the Buyers' Counsel

During the negotiations to sell Plaintiffs' ownership interests in Game Garden, Gallagher sent multiple e-mails to Fugett, counsel for the Buyers, indicating that Gallagher was representing Game Garden.  On August 1, 2013, Gallagher wrote to Fugett, "As I told you, I represent the LLC and, in connection with that representation, Taras Titarenko, it's [sic] manager."  Fugett Decl. Ex. A.  On August 17, 2013, Gallagher wrote to Fugett objecting to a proposed revision to the sale agreement: "The Company cannot agree to your attempted 11th-hour recharacterization of Mr. Titarenko as a contractor."  *Id.* Ex. B.  Gallagher copied the four then-owners of Game Garden on

this e-mail. *See id.*

On September 13, 2013—four days after the sale agreement was concluded—Fugett wrote an e-mail to Gallagher, which stated: "I am writing to let you know that by a unanimous decision of all members of Game Garden, LLC I have been chosen as the new attorney for the Company. This email is also to notify you that the Company will not be using your legal services in the future, with the exception of finishing up the negotiations with Microsoft." Pomortsev Decl. Ex. C. In response, Gallagher wrote, "Ok that is fine. I will forward all of the requested materials and my final bill." *Id.*

### B. Analysis

In light of this evidence, the Court concludes that Game Garden has met its burden of showing that Gallagher represented Game Garden previously and that Gallagher's prior representation of Game Garden bears a "substantial relationship" to Gallagher's current representation of Plaintiffs.

#### 1. Fact of Prior Representation

Plaintiffs do not really deny that Gallagher previously represented Game Garden, at least in some capacity. *See generally* Opp. In reference to the invoice, Gallagher herself admits that she "investigated certain corporate matters related to GGLLC's role as a service provider responsible for distributing Startek's games, including whether there were restrictions on the sale, prospective tax implications, and other issues related to the ongoing relationship between Startek and its service provider, GGLLC." Gallagher Decl. ¶ 9. Moreover, Gallagher's April 5, 2013 letter on behalf of Game Garden concerning "threats to the company's intellectual property interests," her invoice for "Client: Game Garden, LLC," and her e-mails holding herself out as Game Garden's counsel during the sale agreement negotiations convince the Court that Gallagher in fact represented Game Garden in the spring and summer of 2013. Fugett, the recipient of Gallagher's e-mails, stated unequivocally that she "understood Ms. Gallagher to be representing and negotiating on behalf of Game Garden." Fugett Decl. ¶ 5.

Plaintiffs' attempts to minimize or explain away this evidence are unpersuasive. *See* Opp.

at 7-11. Whether Redlikh was Gallagher's primary client, as Plaintiffs emphasize, is of no moment. At best for Gallagher, the evidence above shows that she represented Plaintiffs, Startek, *and* Game Garden—perhaps all at the same time. Accordingly, the Court finds that Game Garden has met its burden to show that Gallagher represented Game Garden in 2013.

### 2. Substantial Relationship

The Court also finds that Game Garden has shown a substantial relationship between Gallagher's prior representation of Game Garden and her current representation of Plaintiffs in this lawsuit.

As to Gallagher's April 5, 2013 letter, Game Garden maintains that the "letter not only demonstrates that Ms. Gallagher was acting as Game Garden's counsel, but that she was doing so in connection with the very subject matter of this litigation"—namely, the app that became *Cat Story*. Mot. at 3. Under penalty of perjury, Pomortsev declared that he "understood the primary subject matter of the letter to be the game that was later published as *Cat Story*." Pomortsev Decl. ¶ 6. Pomortsev says he "understood Ms. Gallagher's reference to 'Game Garden's intellectual property' in this sentence to be a reference to the *Cat Story* game" because "prior to this letter, [Pomortsev] had informed [Plaintiffs] that the *Cat Story* game was being developed by an entity other than South Port Studios." *Id.*

Plaintiffs argue, on the other hand, that the subject of Gallagher's April 5, 2013 letter was not the app that became *Cat Story*, but rather "the threatened improper sale of computer code from the game *Fairy Farm*," a different app that South Port had developed and Game Garden had distributed. Opp. at 8. To support this assertion, Plaintiffs rely on an e-mail chain between Pomortsev and Epikhin dated March 1, 2013. Redlikh Decl. Ex. C. In that chain, Epikhin asked Pomortsev, "what's up with selling the farm code?" *Id.* Pomortsev responded that the prospective purchasers had "changed their mind." *Id.* Pomortsev also apologized for not telling Epikhin earlier. *See id.* Notably, neither Redlikh's declaration nor Gallagher's mentions the April 5, 2013 letter, much less either individual's understanding that the letter concerned the sale of *Fairy Farm*

code. *See generally* Redlikh Decl.; Gallagher Decl.[3]

In the Court's view, the evidence supports Game Garden's interpretation of the April 5, 2013 letter. To start, Game Garden's understanding is consistent with the timeline described in Plaintiffs' complaint, which alleges that in "late 2012" Pomortsev told Redlikh that Fly High's owner "could assist in the development of *PussyVille* for a share in the profits of the application." Compl. ¶ 37. Of greater importance, only Game Garden offers a declaration, under penalty of perjury, explaining how Gallagher's letter was understood at the time. *See* Pomortsev Decl. ¶¶ 6, 8. In particular, Pomortsev says he "understood the primary subject matter of the letter to be the game that was later published as *Cat Story*," *id.* ¶ 6—the very subject of this litigation. Significantly, Redlikh in his declaration does not dispute Pomortsev's understanding of the letter. *See generally* Redlikh Decl. Nor does Gallagher in hers. *See generally* Gallagher Decl. Taking Pomortsev's uncontroverted declaration as true, the Court finds that Game Garden has shown a substantial relationship between the subject matter of the April 5, 2013 letter and the present litigation: both concern an intellectual property dispute among Game Garden's then-owners over the app that became *Cat Story*.

Plaintiffs' only evidence to suggest a contrary understanding is the cryptic March 1, 2013 e-mail chain between Pomortsev and Epikhin. *See* Redlikh Decl. Ex. C. However, this e-mail chain shows, at most, that over a month before Gallagher sent the letter, some prospective purchasers had "changed their mind" and decided not to buy computer code for the game *Fairy Farm*, and that Pomortsev had apologized for not telling Epikhin earlier about the prospective purchasers' change of heart. *Id.* There is no evidence that Plaintiffs were displeased with the fact that Pomortsev was apparently negotiating to sell *Fairy Farm* code. Rather, the fairest reading of the e-mail chain is that Epikhin, who asked, "what's up with selling the farm code?" *id.*, was just seeking an update from Pomortsev on negotiations of which Epikhin was aware. Without more, the connection between this e-mail chain and Gallagher's April 5, 2013 letter is simply too

---

[3] Epkihin did not submit a declaration.

1   attenuated.

2   In addition, the Court finds that Game Garden has shown a substantial relationship
3   between Gallagher's prior representation of Game Garden and Plaintiffs' cause of action for
4   breach of contract.  The evidence shows—and Plaintiffs do not deny—that Gallagher played an
5   integral role in drafting, revising, and finalizing the very sale agreement that Plaintiffs now allege
6   was breached by Pomortsev.  *See* Compl. ¶ 119 (alleging breach of "the September 9, 2013 Sales
7   Agreement"); *see also* Gallagher Invoice (listing entries related to drafting and revising that sale
8   agreement).  Plaintiffs' sole rejoinder appears to be that Game Garden "was not even a party" to
9   "the September 2013 sale agreement."  Opp. at 10.  Plaintiffs, however, make no effort to explain
10  why this matters.  In any event, the evidence shows that Gallagher was representing Game
11  Garden's interests in the negotiations even though Game Garden was not technically a party to the
12  agreement.  For example, Gallagher interjected on behalf of Game Garden in an August 17, 2013
13  e-mail to Fugett: "*The Company* cannot agree to your attempted 11th-hour recharacterization of
14  Mr. Titarenko as a contractor."  Fugett Decl. Ex. B (emphasis added).  As indicated above, Fugett,
15  Gallagher's counterpart in the sale agreement negotiations, "understood Ms. Gallagher to be
16  representing and negotiating on behalf of Game Garden."  Fugett Decl. ¶ 5.  Plaintiffs offer no
17  proof to the contrary.

18  Considering the parties' evidence, the Court concludes that Gallagher previously "had a
19  direct professional relationship with" Game Garden in which Gallagher "personally provided legal
20  advice and services on a legal issue that is closely related to the legal issue in the present
21  representation."  *Cobra Solutions*, 38 Cal. 4th at 847.  As the Court finds a substantial relationship
22  between Gallagher's prior representation of Game Garden and her representation of Plaintiffs in
23  this action, Gallagher must be disqualified.  *See id.* ("When a substantial relationship between the
24  two representations is established, the attorney is automatically disqualified from representing the
25  second client.").

26  **IV.   CONCLUSION**

27  For the foregoing reasons, the Court hereby GRANTS Game Garden's motion to

28

12
Case No. 14-CV-04383-LHK
ORDER GRANTING MOTION TO DISQUALIFY COUNSEL

disqualify Plaintiffs' counsel.  Plaintiffs are hereby ordered to obtain successor counsel who shall file a notice of appearance within twenty-one (21) days from the date of this Order.  Absent a written appearance by successor counsel within the time specified, an order to show cause why this action should not be dismissed with prejudice will issue.

**IT IS SO ORDERED.**

Dated: May 12, 2015

_____
LUCY H. KOH
United States District Judge